We'll hear argument first this morning in Case 13-6827, Holt v. Hobbs. Mr. Laycock. Mr. Chief Justice, and may it please the Court, 40 other prison systems permit beards without a length limit, yet Arkansas prohibits even half an inch. And in their brief, they reject every means that courts have devised to evaluate their testimony. So what they really seek is absolute deference to anything they say just because they say it. And that would be to repeal this statute de facto. There may be deference to prison officials, but there must be concrete limits to that deference. If this prisoner wanted to have a full beard, would RLUIPA require that the prison administration allow him to do that? Well, some courts have said yes. There's very little in this record about full beards and whether they're safe or whether they're dangerous, but the 40 States that permit them suggest that the State would have a difficult burden of proof. But that question is not presented here. Mr. Laycock, the problem I have with your client's claim of religious requirement is the religious requirement is that he grow a full beard, isn't it? Now, let's assume I'm in a religion that requires polygamy. I mean, could I say to the prison, well, you know, okay, I won't have three wives, just let me have two wives. I mean, you're still violating your religion, it seems to me, if he allows his beard to be clipped to 1 inch, isn't he? Well, the religious teaching is a full beard. He testified that religiously half an inch is better than nothing, and he explained that in terms of Hadith that he referenced. He's in a very difficult situation. I don't think he should be penalized for being reasonable here. He offered an extremely conservative compromise to the prison. Well, religious beliefs aren't reasonable. I mean, religious beliefs are categorical, you know. It's God tells you. It's not a matter of being reasonable. God be reasonable. He's supposed to have a full beard. He's supposed to have a full beard, but a partial beard is better than none, and that's not just in secular terms. That's also in religious terms, which he explained on the record. Okay. You think on the record that's what his religion would require if he can't have a full  That's correct, Your Honor. But, I mean, you're really just making your case too easy. I mean, one of the difficult issues in a case like this is where to draw the line. And you just say, well, we want to draw the line at half inch because that lets us win. And the next day someone is going to be here with one inch and maybe it will be you, and then, you know, two inches. It seems to me you can't avoid the legal difficulty just by saying all we want is half an inch. Well, most of the cases seek a full beard or full hair, and sooner or later you will have to decide one of those cases. But this case, he made a pro se decision to limit his request. The Court expressly limited the question presented, so this case is only about one inch. Well, but we have to decide this case pursuant to a generally applicable legal principle. And that legal principle is one, it seems to me, that demands some sort of a limit. And if you are unwilling to articulate a limit to the principle itself, it becomes a little bit difficult to apply it and say, well, we don't know what the limit is because you are only asking a half inch. We will apply a theoretical legal structure and say you fall within it. Well, I think the limit has to be determined on a record in a case that is seeking a longer beard. I think, you know, the larger issue than just half an inch that this case presents is how do you administer the legislative history suggests deference to prison officials in the context of a compelling interest standard. Scalia, so maybe we should, maybe this was improvidently granted. I don't want to do these cases half inch by half inch. Let's take a case that involves a full beard. I mean, the next case will be one inch, then one and a half inches, two inches? They are not going to come in that order. The next case is going to be, most likely the next case is going to be a full beard because that's the great bulk of the cases. This case has a limited question presented and has a serious question of statutory interpretation. The courts below essentially applied the pre-Ralupa constitutional standard. They gave essentially unlimited deference to the prison officials. Kennedy, what has this Court said about the standard under Ralupa with reference to prisons? That the prison has to show that it's the least restrictive alternative in order to meet the requirements of strict scrutiny and that it's the prison's burden? Is that proposition established? Well, your only prison Ralupa case is Cutter, and that was a constitutional  So this is the right standard. Do you think Ralupa displaces Turner as the right standard? It was clearly intended to replace Turner. It textually replaces Turner. And what is the test insofar as you're concerned? The test is compelling interest in least restrictive means and deference must be administered in the context of that standard, not instead of that standard. So if it's a close case on compelling interest, they may well get deference. If they give a reasoned and well-considered and informed explanation, they deserve more deference. More deference would be due. Cutter says some — Cutter says they get due deference, but Cutter had no occasion to decide how much deference is due or how that — how that should be administered. The textual standard is clearly compelling interest in least restrictive means. Sotomayor, could you put your answer in practical terms? The Chief Justice asks you, what's the legal principle that you want us to apply? And you announce it as give them the right deference. It's a little bit circular, the answer, in my mind. Looking at what the circuits have been doing, which one do you think articulates the best approach to RUPTA and what courts should be doing? Well, maybe Judge Gorsuch's opinion in the Tenth Circuit, but I'm not sure any circuit has given a fully elaborated account of deference in the context of a compelling interest test. We think the more reasoned and informed their explanation, the more deference is due. So do they give concrete examples of specific harms? Do they treat similar risks the same way? Do they take account of solutions that have been found to work in other jurisdictions? Do they take account of the religious needs of prisoners at any point? Or do they just reflexively say no? If the standard is other similar risks the same way, then what about a quarter-inch rule, because that's what they allow to people who have dermatological problems? They allow a quarter-inch for medical beards. They don't allow even a quarter-inch for religious beards. But the quarter-inch, I think, for medical beards, I think, fatally undermines their claim that they can't administer a length limit, and it somewhat undermines all their other claims about a half-inch beard. This is in some ways like the case Justice Alito wrote in Newark on the Third Circuit. The medical exception undermines all the alleged reasons for not allowing a religious exception. There are some religious practices. I think that the C practice of not cutting hair ranks as a religious practice. So not cutting hair and wearing a turban, consistent with what you say is the standard. Ginsburg. I don't know what the evidence would show about sick hair wrapped in a turban, but that's clearly a much more serious issue than what's presented in this case. You know, sick hair wrapped in a turban may well be different, but we don't have any evidence about it in this case. We don't really have a way to know on the record in this case. Kagan. Mr. Laycock, you're relying on this case really on felt intuitions that this couldn't possibly advance the State's interest. But for the most part in these cases, there will be some incremental gain with respect to the interests that the State has. So whether it's a full beard or whether it's long hair or whether it's a turban, there will be some ability to say, even though it's just teeny tiny, there is some increase in prison security that results from disallowing this practice. And I guess I want to know, and this really fits in with several of the other questions that have been asked to you, is how do we think about that question in the context of this statute? I think they have to show a material — this is a phrase in the government's brief, and I think it's helpful — a material effect on their security situation. Any teeny tiny risk, however small, is another way of de facto repealing the statute, because you can always imagine some teeny tiny risk. And even in Turner, under the rational basis standard, the Court said the test isn't zero risk. Even in Turner, the Court said you have to incur. Kagan. So teeny tiny isn't enough, but how about, you know, measurable, although small? Or, you know, at what point does it become something that we say, yes, we have to take that into account? Well, I think material or significant may be the best we can do. They say, for example, that in 2011 they confiscated 1,000 cell phones. I don't think a half-inch beard would change that number. But if it went to 1,001 or 1,010, I don't think that's material. If it goes to 1,100, that's a significant increment. But they have to show some material effect on their security situation. And here, where they allowed beards for many years, where 43 states allowed beards, there should be plenty of examples if it were a problem. And, you know, this is not something that's so dangerous no one has tried it. So there should be plenty of examples. And, in fact, they have no examples of anything hidden in beards, and certainly not in a very short beard such as half an inch. This idea of deference comes from legislative history. And that very same legislative history said post hoc rationalizations, exaggerated fears, mere speculation are not enough. And it's for the judiciary to distinguish the two. And I think what we have in this case is exaggerated fears and post hoc rationalization. Roberts Well, the problem with deference, I think, is that if you accept the fact that there is a point at which it does become a problem, the full beard with the turban, then there's the question of how you draw the line. And drawing the line, it strikes me, may be the point at which you will consider deference to the prison administrators. You take deference entirely out of the equation by saying, look, we're only asking for half an inch. Well, we haven't taken deference out of the equation, but when we only ask for half an inch and when they offer so little evidence and no examples and no consideration of solutions elsewhere, they haven't done anything to deserve deference. They haven't shown expertise. And even with deference, you know, even with some degree of deference, it doesn't make out a compelling interest on these facts. And that's the question presented. Sotomayor Could you, you know, we seem to be arguing rules. They say no beards. You say half inch is okay. And then the question begs itself of how about three-quarters of an inch, how about an inch or a full beard. What are we measuring this against? Are you seeking to establish a rule that every prisoner has to be permitted to grow a half-inch beard and no more, or are you asking for a rule that applies just to your client and then articulate why for your client? No. We think, you know, reversal here would establish a right to a half-inch beard for all prisoners on this record, and, you know, unless some other State made a very different showing, all prisoners were general. Sotomayor So what happens – I know the magistrate judge or the judge below here said that it was preposterous to think that this prisoner could hide anything in his half-inch beard, assuming that his half-inch beard was not thickly grown, but some are. And some you can't see the skin.  Wouldn't it be a different set of facts in that case to consider? Well, a State might be able to show that's a different set of facts, you know. But the question is not just is it conceivably imaginable that some prisoner somewhere could hide something in a half-inch beard, but could he hide something there that he couldn't much more easily and more securely hide in the hair on top of his head, in his shoe, in the lining of his clothes? You're arguing for all half-inch beards, right? I mean, we've got to assume all half-inch beards are okay if God tells you to grow them, right? Well, you know, I think that's right. And, again, subject to somebody producing evidence that we're wrong about some half-inch beards. But I think, yes. Yeah. Well, really subject? I mean, whose burden is that? I mean. It is the State's burden that is explicit in the statute. This is an affirmative defense we're talking about. Of compelling interest in least restrictive means. And, you know, the only limit to they impose on the hair on top of your head is it can't extend below the middle of the neck. So you can have long hair, curly hair, afros on top of your head without a length limit. You know, the difference between hair on top of your head and hair on the front of your head is not even rational, right? They could hide more, and the prison warden testified to this. Yeah, you could hide things in the hair on top of your head, but that's not against the rules. So they have singled out the beard that is preserved for, that is worn for religious reasons, and not treated other things that are really indistinguishable. If there are no further questions, I'll reserve the remaining time. Thank you, Professor. Mr. Yang. Mr. Chief Justice, and may it please the Court. This case involves the religious accommodation of a half-inch long beard that BOP in over 40 States would allow a prisoner to wear. The State failed its burden of proving that denying a half-inch religious beard would be the least restrictive means to further a compelling interest. Is it your position that if, what, 90 percent of other institutions similar to the one at issue in the case permit the practice that is challenged, it cannot be a compelling interest? Is that your position? No. In fact, I think our position is that security interests in prisons are compelling, but the burden that LUPA imposes upon the State is a burden to show that the means to do so is not the same as the means to do so in this case. That is a showing that has to be made in court. It is something that Congress specifically recognized would be showing. Well, I understand that, but I'm asking what is the relevance of the fact that other institutions are going to say whenever an institution comes up here that has a restriction which other institutions of the same type do not have, or at least a large majority of them, it's ipso facto bad? No, I don't think it's a dispositive factor. However, it significantly undermines the State showing that a similar restriction could not be had in this context. And the State, in the face of that example, if raised in litigation, would have to provide a reasonable basis for explaining why there might be a distinction between what's going on in other States in BOP and what's going on in this State. And the showing in this case is exceptionally meager. I mean, I would say that's the case. Scalia, Why does it have to show a distinction? It can just say the other States are wrong. We think this is dangerous. I don't care what other States think. I think a little more will be required under the compelling interest test. Now, this Court in Cutter recognized that. Suppose the State just simply says this. You know, actually, there's nothing special about our prison. We can't show you some special circumstance. But what we can show you is that prisons are in the business of making tradeoffs between security and other values. They do that every single day. And our State just thinks that the tradeoff should be more security-oriented. So we insist on a greater level of security than our peer institutions do. And are you saying that the statute prevents a State from doing that? No. I don't think that the statute imposes a least common denominator amongst State prison systems. However, I think there is some bounds to the State's judgment that needs to be. There are some limits, and the State needs to provide a reasoned explanation in order to get deference to its predictive judgment in this context. How do you reconcile deference with the strict scrutiny that the statute requires? Well, this Court in Cutter, for instance, explained that the strict scrutiny, when deciding what is required by strict scrutiny, context matters. Well, there are two questions there. One is, which you – it's a good question. Where does this idea of deference come from in this context? But the question I was asking was, how do you think, assuming that there is a role for deference, how does it fit together with what the statute expressly requires? I don't think there's any dissonance between the idea of strict scrutiny, which is not a degree of proof required. It is a question about whether you've identified a compelling interest and shown that what the burden is, the least restrictive means, that can be shown by a preponderance of the evidence. And so when you're talking about deference in this context, you're talking about deference to the predictive judgments of officials based on their experience and expertise, based on the fact that they are, in fact, charged with protecting the public and administering these prisons. And so when they provide a reasoned explanation based on experience and expertise, they can – don't have to point to a specific example of a half-inch beard in the past resulting in something horrible. Kagan, but I do share Justice Alito's confusion on this point, because all the things that you're talking about are things that we would never allow in the typical strict scrutiny context. You know, all this kind of, well, as long as they say something, they don't really have to prove it, and it just has to sound kind of reasonable. I mean, that's the very opposite of strict scrutiny generally. Well, in this context, remember, the statute doesn't say strict scrutiny. It shows – says that the State has to identify a compelling interest and show that the burden it is imposing is the least restrictive means. It sounds like. It's similar, but remember, this Court in Grutter and in Cutter has recognized that the application of strict, what you might broadly label strict scrutiny, depends on context. And Congress, when they enacted both RFRA and RLUIPA, understood that these two concepts could be administered together. Do you think it's the same standard in both of those statutes? For the large part, yes. I want to caveat that because the language is completely the same. Yes, but in RLUIPA, most of the language is completely the same. The standard is the same, but in RLUIPA, RLUIPA has this additional provision that requires that the terms of the statute be broadly construed to the maximum extent possible to protect religious exercises. But I thought we actually used that in the recent RFRA case to suggest something about RFRA as well. Is that right? That's because RFRA's definition of religious exercise incorporates the RLUIPA definition, but beyond that context, it's at least conceivable that the Court might have a broader interpretation of the protections in RLUIPA than in RFRA.  Ginsburg. Mr. Yang, before you sit down, your brief lists a whole series of cases on page 14 that were decided before RLUIPA, Saffling and a bunch of others. Are all those practices which we approved up for grabs now under RLUIPA? There were restrictions on receipt of publications was one. I think the analysis is different now. It has to be – it could be litigated. Any of these claims could be litigated. The State would then have the burden of coming forward to show that the restriction would in fact be a least restrictive. So they would all – all those that we approved, correspondence limitations, all those would have to be looked at anew under the RLUIPA standard. I think that's right, because if you were to go back to pre-RLUIPA case law, no one would doubt that a State could in fact prohibit a half-inch beard under the prior constitutional standards, but Congress has set a higher bar and it imposes upon States the obligation to come forward to explain and justify. Now – Where are you on the full beard? On the full beard, I think there might well be a difference. But again, RLUIPA depends on a showing in litigation by the State that the means selected is least restrictive means. A State may well be able to show that a full beard would run real risks that are just not present in the half-inch beard that we have here. Well, assuming that's the case, assuming they have some evidence of concealment or whatever in a full beard, what do we do? Just litigate a dozen cases until we settle on one and three-quarters inches or what? Well, I think it's not going to be a bad thing. What I'm doing is the same question I asked your friend, which is what's the legal principle? And if there is no direct legal principle, then isn't it a situation in which you would employ deference to the administrative judgment? I think that's exactly right, that there's going to be a bound, a range of reasonableness that courts will find appropriate to defer to predictive judgments by expert officials in various contexts. Now – Kagan is a similar question, but, you know, lots of religions, including lots of religions of one, have dietary codes of various kinds, so suppose a lot of prisoners say here's my dietary code personal to me and all of that costs money. And let's just stipulate that as prisoners have to spend money on that, they have less money to spend on things relating to internal security. How is somebody supposed to think about those kinds of questions where it's just every time somebody makes a religious claim, the costs to the institution goes up and the ability of the institution to deal with security issues goes down? Well, maybe not necessarily always a second. Certainly you can have costs going up. It may not necessarily affect the security of the institution. But I'm suggesting that costs are going up. They come out of some place. At some limit. That's true. I mean, we all operate under a real world with limited costs, and as the Court recognized in Cutter, the deference. So how do we do that? Excuse me? So how do we do that? Well, I think, again, it's going to depend. If, for instance, factors that would be relevant is the context. Does the increased cost prejudice other types of interests in operating the prison? That would have to be articulated by the State. Well, wait a minute. I mean, so vote more money. All you have to do is raise taxes. We're talking here about a compelling State interest. Bear in mind, I would not have enacted this statute, but there it is. It says there has to be a compelling State interest. And you're asking us, well, let's balance things, let's be reasonable. Compelling State interest is not a reasonableness test at all. It's not me, Your Honor. I think it's what the Court actually recognized in Cutter. The Court, and I'll quote, said that the act needs to be applied in an appropriately balanced way with particular sensitivity, security concerns, and that accommodation must be measured so that it does not override other significant interests. Thank you, counsel. Thank you, Your Honor. Mr. Kern. Mr. Chief Justice, and may it please the Court, Arkansas' security objectives are undermined by the Petitioner's half-inch beard because he could use it to alter his appearance, thwart identification, and conceal contraband in our maximum security prison's unique environment. On altering the appearance, I thought it was conceded that at intake, the prison could take a photograph clean-shaven. Your Honor, that is not on the record. I concede that that was not sufficiently addressed to withstand the summary judgment posture in this case. The record testimony was just, I agree with Professor Laycock, that it wasn't satisfactory. Let me get to what I mean. I don't understand what you just said. Well, there's two points in altered appearance. One is identification within the prison itself, and I want to get to that in one second. One is a post-escape scenario where you're looking for the inmate. Our testimony on that was not engaging in the question. There's no record testimony regarding that. So let me get to identification. Why do you need record testimony on a question such as that? If you're claiming, if he escapes, he can shave off his half-inch beard and thereby alter his appearance, and the response is, well, just take a photograph of him before he grows his half-inch beard, why do you need evidence on that point? It seems to me it's obvious. What prevents you from taking a photograph before he grows the half-inch beard, which can then be distributed to police departments if he escapes? Yeah, I agree, Your Honor. I mean, there are scenarios. It's not an evidentiary matter at all. The point of identification within the prison, though, is an evidentiary matter on this record. And let me get to that, because it's very important to understand this in our prison's unique environment. Ward and Lay testified that shaving a beard can enable an inmate to get into an area where he's not supposed to be in. That's at Joint Appendix page 104. And that a beard can enable an inmate to deviate from an inmate's appearance on an ID badge. That's at Joint Appendix 100. And, of course, a beard is one of the quickest and easiest ways to change one's appearance. That's on page 97 of the Joint Appendix. And, of course, the grooming policy itself speaks in terms of maintaining a standard appearance throughout the period of incarceration, minimizing opportunities for disguise. And let me explain in a minute why this matters in our prison's unique environment and why we're different, because it's a very important point here. The testimony on the record, page 101 of the Joint Appendix, was that we have a very different situation with barracks housing and inmates going outside the fence in large groups of 30 to 60 per barracks unit every day. It's a very high traffic maximum security facility where they come out of a large group of 30 to 60 inmates, go out, and then come back. And there's a lot of traffic there, and in that environment, rapid and accurate identification of the inmate by his face, his ID badge and the like, but also general familiarity with the inmate and who the guards are dealing with is very important in that process. And if a mistake is made, an inmate could get into the barracks where he is not supposed to be in, and an assault could occur, and these are separated by enemies and the like. And that is very serious in our environment. It was made on the record, and it differentiates Arkansas from every State mentioned by the Petitioner and the United States. And you have no example of that ever happening? I have no example of a – well, let me say this. In our brief on footnote 13 and on page 26 of the 18 States amicus briefs, there are examples. There are no record – there are no record examples here. Examples of what? Of inter-prison identification problems, with an escape type, you know, in the prison, a beard being used to thwart identification. And the other thing is that the prisoners who are in the prison, they have a very short beard for medical reasons. No, and let me explain why. There is confusion here as to what this so-called medical beard is. There is no exception in practice of a quantitative matter for medical beards. It is a means of shaving exception. In fact, our policy changed to reflect our actual practice about a year ago. What the practice is, is that when a doctor's order says a person has a dermatological condition or some other scarring or skin condition that needs a shave, they use barber style clippers, electric clippers, without a guard, and they are used directly on the skin. And the result is a very clean-shaven look, not quite as close as using a tamper-resistant safety razor that other inmates use, but it is a very clean-shaven face. The clippers are kept in the barber facility, and a couple of days will provide How long is that? How long are the whiskers when that is done? So they may take barber call maybe twice a week. So they will have a clean-shaven face and then go a couple of days, three days, and then go back to the barber facility. Are you saying that they are completely clean-shaven? I'm saying that they are clean. I mean, what is clean-shaven? Some would say a razor shave looks like. Clean-shaven is somebody like you. Right. I would say that's correct. I've got a fairly dense hair, but that's the appearance immediately after. And that would satisfy the medical problem? That's correct. To shave that closely? That's right. The doctor's prescriptions invariably are get a clipper shave. And that brings a second point up, Your Honor, is that the policy's rationale is follow doctor's orders. And we think that is fundamentally of a different nature than a religious reason, because the Eighth Amendment law of deliberate indifference and the like admits of no countervailing security interests that come into play. Our policy is we follow doctor's orders, and that's the end of the matter. Under the medical law. Are you telling us that the quarter-inch is wrong? I thought that that was in the record as a given, that a quarter-inch is allowed for medical reasons. The policy states that, Your Honor, and it's confusing. In practice, there is no quantitative quarter-inch rule for beards. There is a clean-shaven rule that's allowed some length to go to the next barber call a few days later. You can still see the skin the entire time in that scenario. And if Petitioner wanted to bail himself of that accommodation, we would let him do that. What about the argument that it's, never mind the least restrictive means, you have no comparable rule about hair on one's head, where it seems more could be hidden than in the beard, where you hide something in a beard, it might drop out? Yes, Justice Ginsburg. The material difference there is our professional judgment is the disguise-related component of a beard and shaving that beard is more profound than one on the head. So your point speaks to one of contraband, and I agree as a matter of common sense and logic, there's a length and gravity component to a head that's different than a beard, for sure. But the risk is still there, none the same. I mean, there's an interest in regulating the contraband element, but the head hair doesn't propose the same disguise-related problem as a beard. Why is that so? You're saying that somebody with or without a half-inch beard, that's a bigger difference than somebody who has longish hair versus the same person with a shaved head? In our professional judgment, it is, yes, that's correct, because you're looking at the essential features of a person's face, their jawline, their chin-like, and that's the means by which we identify each other. And so that is a significant difference in our view. And really, the head hair policy complements the facial identification policy because it's not allowed to get to a length that could obscure the hair. And that's the rationale for that. Mr. Laycock characterizes your position as being essentially all deference all the time. So I'll give you an opportunity to say, when would deference be inappropriate? I mean, deference would be inappropriate when the explanation offered on the witness stand in the record of compelling interest and the least restrictive means is neither comports with logic or common sense. I mean, I think — I think it sounds like we're all in agreement on that. And Justice Sotomayor asked which lower court decision would maybe lend the most guidance. I think a rather straightforward but apt analysis is in the Couch case in the Fourth Circuit where Judge Traxler, joined by Justice O'Connor and Judge Shedd, sort of went through the initial obligation is to explain, through reason and common sense, why that approach furthers a compelling interest and a least restrictive means. And once that happens, deference attaches, but that doesn't mean either that you win the case. It just means you have substantial weight. You're sort of a thumb on the scale, so to speak, and more evidence can come into play, and you could still lose. Sotomayor, can I go back to, just so I'm clear in my head, is it two compelling — or two compelling interests, one in identification, one in contraband? That's right, Justice Sotomayor. Is there a third or a fourth, or are those the only two? Those are the only two we're talking about here. All right. In this case, the magistrate judge has said it's preposterous to think that you can hide something. So you don't have a security contraband. Let me take on an almost preposterous, if I might. If you look at the written findings, there is no such finding. In fact, the finding was to the contrary. I believe it's on page 167 of the Joint Appendix. The magistrate judge says, ''The testimony about small bits of dangerous contraband is indeed the most compelling in the entire case.'' And then if you go back and look at the verbal musings from the bench, the judge sort of reflects a layman's view of, well, the idea of contraband and a half-inch beard seems almost preposterous. And then he jumps down to the next paragraph, the immediate paragraph after that, and says, ''Well, then I heard the testimony of experienced, highly experienced correction professionals, and they made me change my mind.'' I mean, he didn't say change my mind. He used the word ''impressed.'' The word ''impressed'' is 155 of the Joint Appendix. So I think what you see here is a judge doing what judges ought to do, which is come to court with their layman's understanding of how things work and then hearing this testimony. Sotomayor It is somewhat hard for me, given what you just said, to figure this out, because there may be, in my mind, some situations with some prisoners where a half-inch beard won't hide anything, and with others that it will. Doesn't this law require you to consider the individual before you and to accommodate them in the least restrictive way? So let's assume that what the magistrate judge meant, which is what I assumed you have the different read, that it's preposterous to think this prisoner could hide something in his beard, but not preposterous to think that others might not be able to do so. Assume my hypothetical. Right. The question, your pose of question, I think, Justice Sotomayor, is whether the warden, I guess, needs to do some sort of hair analysis of this. No, no, no, no. My question is one of whether you're obligated under this statute to look at the request of the individual and assume that the application of whatever rule you create can't have an exception as to that individual. On this testimony, your Honor, you pointed out that the testimony was a half-inch beard, you can't see the skin. And I think that's a functional difference. And we've got to think of how to administer a rule where, to the person, at that level of granularity, it's just not functional. I'm in my yes, but I don't know, given the deference that was given here, the question is, was it applied too broadly? What I'm getting at is, does a court have to look at the individual request and figure out whether it can be accommodated in the least restricted way? Yes, I think it's fair to say that if the court actually did say it was preposterous, another word of saying that defies common sense. In this case? In this case, yes. I think that's right. But I don't think that's an accurate finding of what the magistrate judge says. And I do think that's a problem when that rule is not administrable. Far easier to say, how about an eighth-inch beard where, in all scenarios, you can't see the skin? I mean, you can imagine a warden running that kind of rule much better than, what can we show as to each person's hair type? And if he asked for that kind of accommodation, we would grant it. But he, you know, he's not offered that. He's offered a half an inch. And he's got a very complex lesser of evils type principle. Sotomayor, on the change of looks, I'm still not sure. You say, could you describe in more detail, because I obviously missed it in the record, what is this barrack situation? They leave the compound. Right. Where do they go when they leave the compound? So they're in a barrack situation. They've got 30 to 50 or so in a room, and there are four barracks on each side of a common roof. They go out and they get in a line and different shifts, so to speak, and they go out and they will go to chow, and then they will do their business, and they'll go out and work outside the prison fence in fields, and they will come back again. And it's a very high-traffic environment. Are these unprotected fields? There's guards there watching on. They're not just out working alone, but they're not — there's no prison fence there. I mean, they're up to the guard to keep up with them. So what you have is an environment, which on this record, on page 101 of the Joint Appendix, was we're not like California. We're not like New York. They have cell block housing. And there is no instance in which the government or the Petitioner has said — challenged that as to maximum security facilities. That's a very big difference in the nature of how our institution runs. And we think if deference means anything, it means you don't have to copy the prison policies of other States who don't even have the similar security concerns that we do. Ginsburg. Did you establish that Arkansas is unlike all these other States, that the other States don't have barracks, they don't have people going out to work in the field? I thought that that was not so, that there are other prisons that operate similarly with housing and having the prisoners work on a farm. Two things in response to that, Justice Ginsburg. First is, on this record, there was only two States offered, California and New York. And the undisputed testimony on this record at page 101 is there different, and that stands undisputed. Now, your question is, what about all the footnotes in the briefs to this Court? If you look behind all of the sources cited on those Internet sites, which that's what Petitioner mostly uses, and the government uses Internet sites and also some case law examples, each one of those was referring to a minimum security institution. They've not offered any institutions like ours. As far as I can tell, the only institutions that have something similar to ours have clean-shaven rules. What about the Federal prison system? I thought the rule was throughout the prison system. Both the government and the Petitioner cite a link to the regulation in their briefs, and that is to minimum security status inmates. Alito, when a prisoner goes out in the field and then wants to come back to the barracks, the prisoner is wearing an ID. Is that correct? That's correct. And does it say which barracks that prisoner is supposed to go to? Yes. And what happens is they trade IDs and they trade shirts. I mean, there's – that happens even now. Does the ID have a picture on it?  So the person guarding the barracks, so to speak, the flow to and from the barracks relies on the ID and the face, but also general familiarity with who he's working with, because that's sort of the – I mean, that happens. General familiarity. I'm having difficulty envisioning what you're – the scenario that you're suggesting. So a prisoner who's supposed to be in Barracks A has a half-inch beard, has an ID that says Barracks A, has that person's picture on it, goes out in the field, brings a razor with him. Shave. While he's out there, he shaves. Then he wants to come back and go into Barracks B. How is he going to get into Barracks B if he has an ID that says Barracks A? Now, you say he's going to trade with another prisoner. Then he'll have a different picture on the ID. He's going to alter the – they're going to alter the IDs also while they're out there in the fields? Now, they alter the – they would alter the ID. I mean, they – what happens is you've got very fast recognition. And if they favor each other at all – I mean, this happens now, Your Honor. I mean, so – and the shave would take place probably in the barracks in the morning. But when they come back, the person monitoring the flow of 60 inmates through there gets beaten, and that happens. And the concern is the intermediate – So he has to find somebody who also looks like him from Barracks B. I would think that's how that scenario would work. But that's – that happens. And that's – I mean, prisoners are capable of doing a lot of mischief in prison, as you understand, I think. And that kind of thing happens even now. I mean, we have assaults in the wrong barracks because correctional officers get beat. If one of the hazards is razors, you just said that they can shave themselves in the barracks. Where do they get those razors, and what happens to them? The – we have tamper-resistant safety razors that are issued, and they keep them in their personal possession. And then they – when they're through with them, they can turn them back in on a one-to-one basis and get a new one if they exchange an old one. Ginsburg, does your standard – how, if at all, does your standard differ from what it would be if we had no RLUIPA? Is there any case – now we have RLUIPA – any case that would come out differently in Arkansas under RLUIPA than under the preexisting law? Well, I have to kind of get to the different elements. I think alone for – I mean, I'll talk first about maybe compelling interest. Alone credited prison officials' testimony that Muslim inmates are sort of getting a good rehabilitative event by not having to go back into the prison for Friday prayer because they might as well get used to an intolerant employer when they're out in the free world. That won't pass muster under compelling interest anymore. I mean, that just – that was the old standard. And the interest has to be truly compelling. On least restrictive means, we think that interest grounded mostly in cost and hassle would have survived under the old regime, which had a lot of, say, dietary cases and the like. Those probably will fail a lot more often under RLUIPA than under the previous standard. So if an incremental, like the Yellow Bear case, maybe an incremental increase in more that is required to pass least restrictive means, but it wasn't under the prior standard. So I think even under a deferential approach to RLUIPA, grounded in logic and common sense, you'll still have more vigor under the RLUIPA standard, and cases will go the other way more often than under the prior standard. Sotomayor, about this whole issue about cost and the statute 2000CC3C that says this chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise. Yes, Your Honor. So isn't it – it's anticipating there might be expense. That's exactly right. And so that's, you know, even within the least restrictive means analysis, there's a particular statutory command. Now, I think courts are going to have to manage that with reason, right? We can't have each inmate has his own facility with ten guards around it. There's going to have to be some limit on cost. But I don't know that this case really implicates much of a cost issue, right? Yeah, it doesn't implicate the cost issue. Mr. Kerr, I'm not sure what your position is. I thought earlier that you had pretty much abandoned the concealment justification for the policy. Do you still – and we're relying upon the identification justification? No. We think each justification stands on its own weight and we're— Do you think something can be concealed within a half-inch beard? I think on this record that something as small as a SIM card, which the Court found compelling, could. I do think that the identification within the prison is more weighty here. As far as concealment is concerned, what is the difference between a half-inch beard and hair on the head that's much longer? Well, the testimony on the record was that your common-sense view that longer hair is a better way to conceal contraband, I think, is a right one. The question really is, is a beard an unlikely play? So the testimony here is not only could something fit in a beard, but correctional officers very likely will be somewhat reluctant to do a full search of the beard like they would with, say, head hair. I take it there's no example, not a single example in any State that allows beard policies where somebody did hide something in his beard. I think that's mostly right, Your Honor. I think there's an affidavit in there. We have no example. There's no affidavit. Breyer, if you have an example, then do you think it might fit within the language of that report which says that the fear of people hiding things in their beards is, to use their language, but was it grossly exaggerated? I mean, in 42 States, you know what I'm quoting from? I'm quoting from the report there. The exact words are what they're trying to get at is exaggerated fears. It doesn't even say grossly. Would you say it's an exaggerated fear that people would hide something in their beards when in a country of a very high prison population, not one example has ever been found of anybody hiding anything in his beard, as far as you can tell and as far as I can tell? Do I have that right? As far as I can tell, but let me make a caveat there that I think is important, which is that just because we haven't found the example doesn't mean they aren't there. And the Court's ---- Breyer, there are a lot of things we've never found that might be there, and I'll refrain from mentioning them, but you see them on television, a lot of weird programs from time to time. The problem, Your Honor, Justice Breyer, with this scenario is these kind of things are buried in incident reports, among thousands of other things. In this Court, in the Florence case, Justice Kennedy asked the assistant to the Solicitor General, I thought the evidence here of contraband was rather skimpy. I was surprised to see that there weren't more of this. And the attorney's response was, these things are buried in incident reports. We can't find all of these examples. It's the nature of prisons, but take my newspaper articles. And the Court actually, you know, took note of that as confirming its common-sense intuition there in Part III of its opinion. And I think that's just a problem of empiricism in the prison environment. Alito, as far as searching a beard is concerned, why can't the prison just give the inmate a comb? You could develop whatever kind of comb you want and say, comb your beard. And if there's anything in there, if there's a SIM card in there or a revolver or anything else you think can be hidden in a half-inch beard, a tiny revolver, it will fall out. You know, I suppose that's a possible alternative. I think the concern there is there's no perfect way of searching. And there's a lot of area there, and you're going to have to really monitor to make sure they get out the spots. But that's fair enough. That would be difficult to say, here's a comb, comb your beard? I don't think it would be that difficult. I mean, I'm not in the prison environment. That really wasn't raised on this record. My clients might think that it is. But based on the information I have, I would agree that sounds like that would be something that could be done. And I do think it's important to distinguish sort of the rule that I would propose and that's in the Couch case and that is what I think is very similar to what the government's offering here is really an effort to marry strict scrutiny with deference in a way that doesn't invite empiricism. This Court's strict scrutiny jurisprudence hadn't always demanded examples, especially in the prison context. And I think that's important that we do be allowed to have prophylactic rules in some settings. Justice Ginsburg asked, well, what about literature? We have a rule that says racially inflammatory literature of a religious nature that incites violence isn't allowed in the prison. And Justice Ginsburg in the footnote in the Cutter opinion, you know, seemed to think that, of course, that's a concern that prisons ought to be worried about. That's not susceptible to any kind of empirical proof, I don't think. And as I understand my friend's understanding of the rule, we're in a land of strict speech restriction analysis where prophylactics is to be condemned. We ought to really be using after-the-fact deterrent measures against maximum security inmates who have already shown themselves not to sort of comport with that view of how to behave. And I think that's particularly dangerous in the prison setting, particularly in our prison's environment. Thank you, Your Honor. Thank you, counsel. Professor Laycock, you have five minutes left. On the issue of the written findings, the magistrate said it's almost preposterous to believe he can hide anything in his beard, and then he immediately said, but there's a larger principle here, which is I have to defer to these people. And the subsequent written findings are based on that mistaken level of deference. He said three times I'm constrained by the Feigin's case. The Eighth Circuit precedent essentially applied the pre-reloop of constitutional rule, the magistrate was bound by that, and he gave that level of deference and he made written findings apart from what he had actually seen. On the issue of identification inside the prison, prisoners can shave their heads, shave their mustache, shave their medical beards. They don't claim that's a significant problem. The other 43 States do not appear to have found this to be a significant problem. It is a small and manageable problem. The — on the question of the quarter-inch medical beard, the policy is in the appendix to our brief at page 11A. This morning is the first time we've heard, well, it's really not a quarter-inch rule, it's really some other kind of rule. It's the first time we've heard we let a religious claimant have a medical beard. They've never said that before. And, you know, they had not been able to justify their policy. They do have to prove it, Justice Kagan, and if the proof comes close, they get deference. If they offer serious evidence, they get deference. But here they offered very limited conclusory testimony, no examples, in a situation where there should be plenty of examples. You can't administer a prison and maintain any kind of safety and security if you don't have some sense of where prisoners hide things. They don't have to dig out the data from the files. If prisoners were routinely hiding things in beards, these two witnesses would have known that, would have remembered it from the earlier rule in Arkansas, and it would be easy to get examples of that from other States. There's simply no evidence in this record that it's a significant problem. Sotomayor, what about the argument that there's no comparison, that Arkansas is unique in the way it houses its prisoners, and that the rules that were cited elsewhere have to do with minimum security facilities? Arkansas may be somewhat different in how it, in the number of maximum security prisoners working outside in the fields, but that does not make the half-inch beard any more attractive of a hiding place. If I'm out in the fields and I'm trying to smuggle something back in, I've still got lots of better places to smuggle it, including my shoes and my pockets and the lining of my clothes, and as Mr. Curran just agreed, the hair on top of my head. Again, there's just not a rational difference between where on the head the hair is located. Kagan. You made a statement just then, Mr. Laycock, about how to think about deference in the context of this statute. And it's something that still troubles me, so I'm going to ask you to expand on that. I mean, to say a little bit, it just seems like a contradiction in terms, so I want to understand how it's not a contradiction in terms. Well, there's obviously some tension here, but the legislative history says due deference. Caterpillar includes that legislative history and says due deference to expertise. It doesn't say how much deference is due. That's the question to be decided here. We think the more informed and considered and well-explained their decision, the more deference it naturally deserves, the more deference is due. But they have to take some account of the prisoner's religious needs. They have to take some account of solutions that have been found to work in other states. If it's something so dangerous no one would ever try it, like the sick curpan, then of course you wouldn't expect examples. But here, 43 states have tried it. Arkansas tried it for years. In a situation like that, where there ought to be plenty of examples if there's a problem, they ought to have to produce some of those examples. So the degree of deference that is due depends on the quality of their explanation, the quality of their consideration of the issue. And here, there's no indication they ever considered the religious needs of the prisoners in the adoption of this rule. Or if they ever took a second look at it after RLUIPA was adopted. And the testimony is very conclusory, devoid of examples, devoid of attention to other jurisdictions. The level of deference cannot be so great as to negate the statutory standard. You have to administer deference within that standard, not substitute deference for the standard. And the statutory standard is still compelling interest in least restrictive means.  Roberts. Roberts. Thank you, counsel. The case is submitted.